

## NUMBER 13-08-00100-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

---

**JAIRO A. PUENTES, M.D.,**                                      **Appellant,**

**v.**

**SPOHN HEALTH NETWORK**
**AND CHRISTUS SPOHN HEALTH**
**SYSTEM CORPORATION D/B/A**
**CHRISTUS SPOHN HOSPITAL,**                               **Appellees.**

---

### On appeal from the 319th District Court of Nueces County, Texas.

---

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Garza and Vela
### Memorandum Opinion by Justice Garza

Appellant, Jairo A. Puentes, M.D., challenges the trial court's summary judgment in favor of appellees, Spohn Health Network and Christus Spohn Health System Corporation d/b/a Christus Spohn Hospital.[1] Dr. Puentes sued Spohn alleging, among other things, violations of the Texas Free Enterprise and Antitrust Act (the "TFEAA"). *See* TEX. BUS. & COM. CODE ANN. §§ 15.01-.52 (Vernon 2002). By two issues, Dr. Puentes

---

[1] Appellee Spohn Health Network will be referred to as the "Network," and appellee Christus Spohn Health System Corporation as the "System." Collectively, the appellees will be referred to simply as "Spohn."

contends that the trial court erred in granting summary judgment to Spohn because: (1) Dr. Puentes was not required to produce evidence of dominant market share because Spohn's actions constituted a per se antitrust violation; and (2) the trial court misidentified the "relevant market" in determining whether Spohn had acted in an anticompetitive manner. We affirm.

## I. BACKGROUND

The Network, a wholly-owned subsidiary of the System, provides managed healthcare services for various employers in a twelve-county area around Corpus Christi, Texas. Dr. Puentes is a pain management physician practicing in Corpus Christi; he also provides radiological imaging services to patients through an entity known as Medical Specialist Group, P.A. d/b/a Saratoga Medical Center ("Saratoga"). Dr. Puentes is a member of the Network; accordingly, if another doctor in the Network refers a patient to Dr. Puentes for pain management treatment, the Network allows reimbursement for that treatment. However, if a doctor refers a patient to Saratoga for radiological services, the Network will not reimburse for those services.

On February 7, 2002, Dr. Puentes filed an application with the Network to allow Saratoga to join the Network as an ancillary provider of radiological services. According to Dr. Puentes, ancillary provider status would allow Saratoga to obtain reimbursement from the Network for radiology referrals from other Network doctors. On March 1, 2002, the Network denied Saratoga's application, ostensibly because Dr. Puentes himself is not credentialed as a radiologist.

Dr. Puentes filed suit against Spohn on November 22, 2002, asserting multiple causes of action including negligence, breach of contract, tortious interference with prospective business relations, and violations of the TFEAA.[2] *See id.* The basis of Dr.

---

[2] The parties refer at various times to four amended original petitions filed by Dr. Puentes between 2002 and 2007; however, the record before this Court contains only the initial original petition filed by Dr. Puentes on November 22, 2002.

Puentes's claims under the TFEAA was that Spohn had acted in an anticompetitive manner by refusing to allow Saratoga to receive reimbursement from Network referrals. According to Dr. Puentes, the actual reason that Saratoga's application was denied was because Saratoga charges less for radiological services than do the System-owned hospitals, which are eligible for reimbursement. Dr. Puentes claimed that, by refusing to allow Saratoga to be reimbursed, Spohn was impermissibly "protecting [its] hospital[s] from competition."[3] Spohn notes that Dr. Puentes further alleged in his second amended original petition, filed on July 8, 2005, that Spohn "conspired with others who provide radiology testing facilities to keep prices in the Corpus market artificially high, which benefits the hospital defendant."[4]

Spohn filed a motion for partial[5] traditional summary judgment on February 19, 2007, asserting in part that: (1) the Network does not possess sufficient market power in the relevant market to be liable under the TFEAA; (2) even if the Network did possess sufficient market power in the relevant market, Dr. Puentes cannot show that it willfully acquired or maintained such power; and (3) Dr. Puentes did not identify any entity with whom the Network "conspired" to restrain trade. Spohn also filed a motion for no-evidence summary judgment as to all of Dr. Puentes's causes of action on May 9, 2007, contending in pertinent part that Dr. Puentes produced no evidence showing: (1) that the alleged restraint of trade is unreasonable or has an adverse affect on competition in the relevant

---

[3] Dr. Puentes's 2002 petition contained the following paragraph asserting a cause of action under the TFEAA:

> Defendants have violated the Texas Anti-Trust and Restraint of Trade statutes in that they have refused to allow Plaintiff to obtain reimbursement for MRI and like services, upon a referral basis for Network patients. Defendants have refused to allow Plaintiff to be reimbursed for these services at its business location while protecting Defendant hospital from competition. Because of Defendants['] share of the hospital market in conjunction with the insurance network, Defendants through their joint enterprise have restrained trade and restricted access to Plaintiff's services.

[4] As noted *supra* note 2, Dr. Puentes's second amended petition does not appear in the record.

[5] This motion was for "partial" summary judgment in that it only addressed Dr. Puentes's antitrust and tortious interference causes of action.

3

market; (2) that the Network has a sufficient market share to exert an anticompetitive effect on the market; (3) that Dr. Puentes has standing to assert an antitrust injury; (4) that Spohn constitutes a monopoly; (5) that Spohn attempted to monopolize; (6) that Spohn engaged in price fixing; or (7) that Spohn conspired, combined, or contracted in restraint of trade.

Accompanying Spohn's motions was an affidavit executed by Robert David Frum, a regional vice president for the System and acting Executive Director of the Network. Frum stated in the affidavit that the "relevant market" in which the Network competes is the twelve-county area around Corpus Christi, and that this area has over a dozen other managed healthcare providers serving employers. Frum further stated that, according to his data, the Network's share of the relevant market, taking into account all competing managed healthcare providers, was 14.67% in 2002 and decreased to 7.18% in 2006. In his responses, Dr. Puentes attached deposition testimony by Frum stating that the System, which owns and operates several hospitals throughout the area, "retains about 65 percent market share of inpatient discharges."

The trial court granted both motions for summary judgment on June 7, 2007. This appeal followed.[6]

## II. STANDARD OF REVIEW

We review a trial court's grant of a traditional motion for summary judgment under a de novo standard of review. *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 816 n.7 (Tex. 2005) (citing *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 290 n.137 (Tex. 2004)); *Alaniz v. Hoyt*, 105 S.W.3d 330, 345 (Tex. App.–Corpus Christi 2003, no pet.). To obtain relief via a traditional motion for summary judgment, the movant must establish that no material fact issue exists and that it is entitled to judgment as a matter of law. TEX. R.

---

[6] On appeal, Dr. Puentes challenges the summary judgment orders solely as they relate to his claims under the TFEAA. Accordingly, we may not disturb the judgments as they relate to his other causes of action. *See* TEX. R. APP. P. 47.1; *Martinez v. El Paso County*, 218 S.W.3d 841, 844 (Tex. App.–El Paso 2007, pet. dism'd) ("When reviewing a civil matter, an appellate court has no discretion to consider an issue not raised in the appellant's brief.").

4

Cɪᴠ. P. 166a(c); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002); *Mowbray v. Avery*, 76 S.W.3d 663, 690 (Tex. App.–Corpus Christi 2002, pet. denied).  If the movant produces evidence sufficient to show it is entitled to summary judgment, the non-movant must then present evidence raising a fact issue.  *See Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996).  In deciding whether there is a disputed fact issue that precludes summary judgment, evidence favorable to the non-movant will be taken as true.  *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997) (citing *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985)).  Evidence favorable to the movant, however, will not be considered unless it is uncontroverted.  *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex. 1965).  Moreover, every reasonable inference will be indulged in favor of the non-movant and any doubts resolved in its favor.  *Grinnell*, 951 S.W.2d at 425 (citing *Nixon*, 690 S.W.2d at 549).

For a no-evidence summary judgment motion to be successful, the party seeking the judgment must assert that no evidence exists as to one or more of the essential elements of the non-movant's claims which the non-movant would have the burden to prove at trial.  *See* Tᴇx. R. Cɪᴠ. P. 166a(i); *Holstrom v. Lee*, 26 S.W.3d 526, 530 (Tex. App.–Austin 2000, no pet.).  When responding to a no-evidence motion, the non-movant is required to present more than a scintilla of probative evidence raising a genuine issue of material fact as to one or more of the challenged elements.  *See AMS Constr. Co., Inc. v. Warm Springs Rehab. Found., Inc.*, 94 S.W.3d 152, 159 (Tex. App.–Corpus Christi 2002, no pet.); *Oasis Oil Corp. v. Koch Ref. Co.*, 60 S.W.3d 248, 252 (Tex. App.–Corpus Christi 2001, pet. denied).

If the trial court's order granting summary judgment does not specify the ground or grounds relied upon for the ruling, as is the case here, we will affirm the judgment on appeal if any of the theories advanced by the movant are meritorious.  *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (quoting *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989)).

## III. APPLICABLE LAW

The TFEAA provides in relevant part that "[e]very contract, combination, or conspiracy in restraint of trade or commerce is unlawful," and that "[i]t is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce." TEX. BUS. & COM. CODE ANN. § 15.05(a), (b). We construe these provisions in accordance with federal antitrust caselaw. *Id.* § 15.04; *Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 688 (Tex. 2006); *see Star Tobacco, Inc. v. Darilek*, 298 F. Supp. 2d 436, 440-41 (E.D. Tex. 2003) (noting that sections 15.05(a) and (b) of the TFEAA are analogous to sections 1 and 2 of the federal Sherman Act).

To establish that Spohn contracted, combined, or conspired in restraint of trade in violation of section 15.05(a), Dr. Puentes must show that the alleged contract, combination, or conspiracy is unreasonable and has an "adverse effect on competition in the relevant market." *See Winston v. Am. Med. Int'l*, 930 S.W.2d 945, 951-52 (Tex. App.–Houston [1st Dist.] 1996, no pet.) (quoting *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990)). To establish that Spohn monopolized in violation of section 15.05(b), Dr. Puentes must show: (1) Spohn's possession of monopoly power in the relevant market; and (2) Spohn's willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident. *See Caller-Times Publ'g Co. v. Triad Commc'ns, Inc.*, 826 S.W.2d 576, 580 (Tex. 1992) (citing *United States v. I.T.T. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). To establish attempted monopolization, Dr. Puentes must show: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc., v. McQuillan*, 506 U.S. 447, 456 (1993); *Star Tobacco, Inc.*, 298 F. Supp. 2d at 447.[7]

---

[7] It is undisputed that Dr. Puentes's TFEAA claims allege violations of only either subsection 15.05(a) or (b), or both, but not of any other provision of section 15.05. *See, e.g.,* TEX. BUS. & COM. CODE ANN. § 15.05 (c) (Vernon 2002) (prohibiting exclusive dealing contracts); *id.* § 15.05(d) (prohibiting mergers or acquisitions that substantially lessen competition); *id.* § 15.05(e)(1) (prohibiting certain employment restrictions).

It is well-established that the TFEAA and the Sherman Act do not prohibit all restraints of trade; rather, they prohibit only those that restrain trade unreasonably. *See, e.g., Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 60 (1911); *DeSantis*, 793 S.W.2d at 687. Under this rule—the so-called "rule of reason"—the fact-finder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition. *Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 50 (1977).

However, "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable." *Id.* (citing *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)). Such "per se" antitrust violations fall outside the rule of reason analysis and are "illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Id.* Examples of such actions include price fixing, division of markets, group boycotts, and tying arrangements. *Affiliated Capital Corp. v. City of Houston*, 700 F.2d 226, 236 n.13 (5th Cir. 1983) (citing *N. Pac. Ry. Co.*, 356 U.S. at 5). If a plaintiff shows that a challenged practice is of a type that has been historically classified as illegal per se, there is no need for the plaintiff to prove the precise harm to competition that the practice may have caused. *See Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 343-45 (1982); *N. Pac. Ry. Co.*, 356 U.S. at 5.

Still, per se liability is reserved for actions that are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (citing *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)). Accordingly, courts are reluctant to adopt per se rules "where the economic impact of certain practices is not immediately obvious." *Texaco Inc.*, 547 U.S. at 5 (citing *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)).

## IV. ANALYSIS

We note at the outset of our analysis that Dr. Puentes cannot sustain an action

under subsection 15.05(a) of the TFEAA, regarding conspiracies or combinations in restraint of trade, because he has not provided any evidence that Spohn—either the Network or the System—engaged in any concerted action with any other independent entity. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 761-762 (1984) (noting that, in order to recover under subsection 15.05(a), a plaintiff must assert concerted action between two or more entities). Further, a violation of subsection 15.05(a) cannot be based on concerted action between a corporation and its wholly-owned subsidiary, such as the two appellees in the instant case. *See Copperweld Corp.*, 467 U.S. at 761-62; *Red Wing Shoe Co. v. Shearer's, Inc.*, 769 S.W.2d 339, 345 (Tex. App.–Houston [1st Dist.] 1989, no writ). Dr. Puentes also refers obliquely in his appellate brief to alleged price fixing by the Network, which would constitute a per se antitrust violation. *See Affiliated Capital Corp.*, 700 F.2d at 236 n.13. However, price fixing rises to the level of per se illegality only when it involves a pricing agreement between two or more competing entities in the same market. *See Texaco Inc.*, 547 U.S. at 5-6 (noting that "price setting by a single entity—albeit within the context of a joint venture—and not a pricing agreement between competing entities with respect to their competing products" was not "price fixing in the antitrust sense"). Because Dr. Puentes has provided no evidence that Spohn entered into a pricing agreement with any other entity, price fixing may not serve as a basis for his claims under subsection 15.05(a).

We instead focus our attention in this analysis on Dr. Puentes's claims under subsection 15.05(b), regarding monopolization and attempted monopolization. The crux of Spohn's motions for summary judgment with respect to subsection 15.05(b) is that Dr. Puentes failed to produce any competent evidence showing that the Network possessed monopoly power in the relevant market. *See Caller-Times Publ'g Co.*, 826 S.W.2d at 580. In his response to the motions for summary judgment and by his first issue on appeal, Dr. Puentes claims that the instant case "involves a clear situation where market prices are higher because of [the Network]'s actions" and therefore that "the need to analyze market

8

share to determine the effect on the market does not exist." More specifically, Dr. Puentes alleges that he "has shown that the reason [he] was denied referrals is because of lower charges," and that this fact in and of itself constitutes harm to the relevant market. Therefore, according to Dr. Puentes, Spohn's actions are per se illegal and so he was not required to present evidence regarding Spohn's market power. *See Maricopa County Med. Soc'y*, 457 U.S. at 343-45; *N. Pac. Ry. Co.*, 356 U.S. at 5.

We disagree that Spohn's alleged anticompetitive actions are illegal per se. Dr. Puentes has not pointed to any authority, nor can we find any, indicating that an action producing higher prices in a relevant market constitutes, by itself, a per se illegal activity, and we decline to create such a rule in this context. A per se rule is appropriate only after courts have had considerable experience with the type of restraint at issue, and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason. *Leegin Creative Leather Prods. v. PSKS, Inc.,* 551 U.S. 877, 127 S. Ct. 2705, 2713 (2007); *see Maricopa County Med. Soc'y*, 457 U.S. at 344. Dr. Puentes has given us no reason to be confident that the rule of reason would invalidate Spohn's practice of allowing only credentialed radiologists—who happen to charge more for their services than do those without such credentials—to receive reimbursements for radiology referrals within its network. Further, we cannot say that the economic impact of Spohn's practices is "immediately obvious." *See Texaco Inc.*, 547 U.S. at 5. Accordingly, a per se rule would be inappropriate here.

Because Spohn's alleged anticompetitive actions are not per se illegal, they must be analyzed under the rule of reason. Dr. Puentes bears the burden under that rule of showing that Spohn's actions had an adverse effect on competition in the relevant market. *DeSantis*, 793 S.W.2d at 688; *see Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29 (1984). Additionally, in monopoly cases, "[e]vidence of a defendant's market share is the principal tool used by courts to determine the existence of monopoly power." *Dimmitt Agri Indus., Inc. v. CPC Int'l, Inc.*, 679 F.2d 516, 521 (5th Cir. 1982). A market share of 90

9

percent or higher creates a presumption of monopolization, while it is doubtful whether a 60 percent market share would be enough, and 33 percent is generally considered insufficient to constitute a monopoly. *See id.*; *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 424 (2d Cir. 1945). Dr. Puentes referred in his initial 2002 petition to Spohn's "share of the hospital market in conjunction with the insurance network" and repeatedly referred to Spohn's "dominant" market position in his responses to Spohn's motions for summary judgment. On appeal, Dr. Puentes principally points to Frum's deposition testimony which was attached to his responses to Spohn's motions for summary judgment. In that testimony, Frum stated that the System "retains about 65 percent market share of inpatient discharges" in Nueces County. However, Dr. Puentes produced no actual evidence regarding the market share of the *Network* for managed healthcare services in the Corpus Christi area. Without any such evidence, Dr. Puentes cannot sustain an action under subsection 15.05(b). *Dimmitt Agri Indus., Inc.*, 679 F.2d at 521; *Caller-Times Publ'g Co.*, 826 S.W.2d at 580.

Dr. Puentes notes that the TFEAA does not explicitly require a showing of market share and urges us to conclude that a showing of market share is therefore unnecessary to a successful antitrust action. However, we are precluded by precedent from construing the statute so narrowly. Indeed, even the rule of reason, one of the fundamental tenets of antitrust law, does not appear on the face of the statute but was implied into the statute by courts at the direction of Congress.[8] *See Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 688 ("The legislative history makes it perfectly clear that [Congress] expected the courts to give

---

[8] As Justice Stevens stated:

> One problem presented by the language of [section] 1 of the Sherman Act is that it cannot mean what it says. The statute says that "every" contract that restrains trade is unlawful. But . . . restraint is the very essence of every contract; read literally, [section] 1 would outlaw the entire body of private contract law. Yet it is that body of law that establishes the enforceability of commercial agreements and enables competitive markets—indeed, a competitive economy—to function effectively.

*Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 687-88 (1978) (footnotes omitted); *see United States v. Topco Assocs.*, 405 U.S. 596, 606 (1972) ("Were [section] 1 to be read in the narrowest possible way, any commercial contract could be deemed to violate it.").

shape to the [Sherman Act]'s broad mandate by drawing on common-law tradition."). Just as we are bound to implement the rule of reason in determining whether to invalidate a restraint of trade, we must also enforce the requirement that market power be established in order to maintain a monopoly action. *See I.T.T. Grinnell Corp.*, 384 U.S. at 570-71; *Caller-Times Publ'g Co.*, 826 S.W.2d at 580.

By his second issue, Dr. Puentes attempts to reframe the debate by contending that the particular market considered by the trial court—the sale of managed healthcare services in the Corpus Christi area—was not the "relevant market" for purposes of determining whether Spohn's actions were illegal restraints of trade. Rather, according to Dr. Puentes, the relevant market consists only of Network physicians; it therefore follows that Spohn had absolute control and a complete monopoly in this market. We disagree with Dr. Puentes's recharacterization of the relevant market.

The "relevant market" is a combination of the relevant product market and the relevant geographic market. *C.E. Servs, Inc. v. Control Data Corp.*, 759 F.2d 1241, 1244 (5th Cir. 1985); *Caller-Times Publ'g Co., Inc.*, 826 S.W.2d at 580. In determining the relevant product market, "no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purpose make up that 'part of the trade or commerce,' the monopolization of which may be illegal." *United States v. E. I. Du Pont de Nemours Co.*, 351 U.S. 377, 395 (1956). Products are generally in the same market if they are reasonably interchangeable. *Caller-Times Publ'g Co., Inc.*, 826 S.W.2d at 584 n.13.[9]

Here, it is undisputed that the services offered by the dozen or more managed healthcare providers that compete with the Network in the Corpus Christi area are "reasonably interchangeable" with the services provided by the Network itself. In fact, the evidence was uncontroverted that Dr. Puentes could—and did—receive referrals, and

---

[9] The proscription against monopolies applies with equal force to both service and product markets. *C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1245 n.1 (5th Cir. 1985).

reimbursements for services provided as a result of those referrals, from competing managed healthcare networks. We further note that it was Dr. Puentes's burden to establish the relevant market, *see C.E. Servs, Inc.*, 759 F.2d at 1244; nevertheless, he does not point to any evidence produced in response to Spohn's motions for summary judgment that is probative on this issue. Therefore, we cannot countenance Dr. Puentes's attempt to shift the definition of the relevant market in this case.

We conclude that the trial court did not err by granting Spohn's no-evidence motion for summary judgment on the grounds that Dr. Puentes failed to produce evidence showing Spohn constitutes a monopoly, that Spohn attempted to monopolize, or that Spohn otherwise conspired, combined, or contracted in restraint of trade in the relevant market.[10] Dr. Puentes's two issues are overruled.

## V. CONCLUSION

The trial court's no-evidence summary judgment in favor of Spohn is affirmed.

DORI CONTRERAS GARZA,
Justice

Memorandum Opinion delivered and
filed this 11th day of June, 2009.

---

[10] Because we find that the trial court's no-evidence summary judgment was justified on these grounds, we need not address the other grounds for no-evidence summary judgment asserted by Spohn. *See* TEX R. APP. P. 47.1; *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). We also need not address Spohn's traditional motion for summary judgment. *See* TEX. R. APP. P. 47.1; *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004) (noting that, if the plaintiffs fail to produce more than a scintilla of evidence under the no-evidence summary judgment burden, then there is no need to analyze whether plaintiff's proof satisfied the traditional summary judgment burden).